# EXHIBIT 4

FD-302 (Rev. 5-8-10)



# FEDERAL BUREAU OF INVESTIGATION

Date of entry     04/10/2025

On March 19, 2025, JACK DANIELS (DANIELS), date of birth █████, was interviewed at the United States Attorney's Office located at 312 N. Spring St., Los Angeles, CA 90012. Also present was DANIELS' counsel Michael Tremonte, Department of Justice (DOJ) Trial Attorney Ted Kneller, DOJ Trial Attorney Kate McCarthy, Assistant United States Attorney (AUSA) Jim Hughes, United States Postal Inspector Al Herzog, Internal Revenue Service- Criminal Investigation (IRS-CI) Special Agent (SA) Marissa Jerry, and Federal Bureau of Investigation (FBI) SA Lesley Buchan. DANIELS was admonished to be truthful and complete. DANIELS was advised DANIELS was present voluntarily and could consult with DANIELS' counsel, take a break, or stop the interview at any time. After being advised of the identities of the interviewing parties and the nature of the interview, DANIELS provided the following information:

In around spring of 2015, KALISTRATOS KABILAFKAS (KABILAFKAS) first told DANIELS that KABILAFKAS was thinking of buying a corporate shell to run a new business. In summer of 2015, KABILAFKAS told DANIELS that KABILAFKAS was buying the shell company and KABILAFKAS found a business to operate within the shell. KABILAFKAS's friend MARIUS DE MOS (DE MOS) was also involved. KABILAFKAS told DANIELS the project was an airborne wireless network which involved using airplanes and routers or repeaters to transmit signals. The new company did not have a name at that time. Toward the end of summer 2015, KABILAFKAS told DANIELS that KABILAFKAS purchased the shell company and wanted DANIELS to meet the lawyer who put the deal together, THOMAS STEPP (STEPP). STEPP represented KABILAFKAS in the pursuit of what would become AIRBORNE WIRELESS NETWORK (ABWN). STEPP helped facilitate KABILAFKAS's purchase of the corporate shell. STEPP never represented DANIELS as an attorney. KABILAFKAS told DANIELS buying a shell company was a better way of operating as opposed to setting up a new company. DANIELS did not know from whom KABILAFKAS purchased what became ABWN.

JIMMY FOUSEKIS (FOUSEKIS) was a good friend of KABILAFKAS. DANIELS knew FOUSEKIS in 2015, but did not know whether FOUSEKIS was involved in the purchase of the shell company. DANIELS only knew FOUSEKIS socially. DANIELS did not know whether FOUSEKIS was involved with ABWN. FOUSEKIS was not

---

| Investigation on | 03/19/2025 | at | Los Angeles, California, United States (In Person) |

File #  318C-LA-3225533                                      Date drafted  03/24/2025

by  BUCHAN LESSEY

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

DOJ-PROD-0000061639

involved with the operations of ABWN, but KABILAFKAS told DANIELS that FOUSEKIS brought some Greek investors to ABWN. Around summer or fall of 2015, DANIELS learned one of KABILAFKAS's friends who was an Archbishop in the Greek Orthodox Church was involved with the purchase of ABWN. DANIELS learned the Archbishop put up the money to acquire the shell corporation. KABILAFKAS did not tell DANIELS why the Archbishop was involved in the purchase of ABWN, but DANIELS knew KABILAFKAS and the Archbishop were close friends. Whenever the Archbishop came to Los Angeles, KABILAFKAS picked the Archbishop up from the airport. DANIELS sometimes met with KABILAFKAS and the Archbishop when the Archbishop was in Los Angeles.

DANIELS reviewed Bates 00014044-00014046, which was a Securities and Exchange Commission (SEC) Form 8k dated October 19, 2015. It was not true that DANIELS paid $250,000 cash from personal funds to acquire 84 million shares of stock in AMPLE-TEE (AMPLE-TEE). DANIELS understood KABILAFKAS bought AMPLE-TEE. The Archbishop never loaned DANIELS money to purchase AMPLE-TEE. DANIELS never had conversations with the Archbishop about anything business-related, the company, or the transaction.

KABILAFKAS's nickname for DANIELS was "Mr. President." DANIELS was given the title of "President" of ABWN, but DANIELS was not able to make any decisions for the company. KABILAFKAS, DE MOS, JASON DE MOS (JASON), JEFF WOLIN (JEFF), and ANDREW WOLIN (ANDREW) all knew DANIELS could not make decisions, but they called DANIELS "Mr. President" anyway. KABILAFKAS made DANIELS the President of ABWN to cover up KABILAFKAS's involvement as the actual owner of the company. DANIELS did not fully understand the reasons at the time. KABILAFKAS operated ABWN and traded ABWN stock. KABILAFKAS never told DANIELS when KABILAFKAS was trading stock or how much. KABILAFKAS only told DANIELS if KABILAFKAS did well or poorly from trading stocks. DANIELS did not hold any shares of ABWN. DANIELS understood ERIC SCHEFFEY (SCHEFFEY) bought some shares of ABWN. DANIELS did not know whether FOUSEKIS or others bought shares of ABWN.

The ABWN office was originally DE MOS's office space. DE MOS had a business with DE MOS's wife, so DE MOS already had an existing lease for office space. DE MOS found the patent for ABWN. DE MOS and KABILAFKAS decided to use DE MOS's office space for ABWN since DE MOS already had the space. Most people showed up to the office. KABILAFKAS did not always come to the office. DANIELS often met KABILAFKAS at KABILAFKAS's home or coffee shops. DANIELS went into the ABWN office. JEFF and ANDREW came into the office. MIKE WARREN (WARREN) came into the ABWN office when WARREN became the the Chief Executive Officer (CEO) of ABWN. CHRIS MCMANUS (MCMANUS) came into the office later. MCMANUS brought in a rich uncle to invest some money in ABWN. JASON sometimes came into the office but lived far away.

DANIELS's role at ABWN was to pretend DANIELS was the President of the company. KABILAFKAS hired an accounting firm for ABWN. DANIELS started getting calls from the accounting firm but did not know how to answer the questions. KABILAFKAS told DANIELS what to the tell the accounting firm. DANIELS understood KABILAFKAS did not want to be seen as running ABWN. KABILAFKAS did not want the accountants or investors to know KABILAFKAS ran the company.

KABILAFKAS created an email for DANIELS at ABWN, j.edward@airbornewirelessnetwork.com. At the same time KABILAFKAS set up the email account at ABWN for DANIELS, DANIELS was already receiving emails from the accounting firm to DANIELS's other email account, daniels@calwestpartners.com. DANIELS never used the ABWN email. DANIELS understood KABILAFKAS, JEFF, and ANDREW used DANIELS's ABWN email account. KABILAFKAS, JEFF, and ANDREW told DANIELS they would check DANIELS's ABWN email for DANIELS. KABILAFKAS, JEFF, and ANDREW ran the ABWN office, so it made sense to DANIELS that they would check the email as well.

DANIELS eventually started concentrating on the development of the airborne wireless technology with DE MOS. The project was fun and interesting, but there was not a lot of work for DANIELS, because the project was technical and involved making appointments with people that worked in the technology industry. DE MOS was the technology person at ABWN. DANIELS did not have much to do, but DANIELS helped where he was able. DANIELS and DE MOS discussed ABWN's hiring needs for people with a certain expertise. DANIELS and DE MOS discussed scheduling meetings and conferences with other companies like FACEBOOK and GOOGLE. DANIELS and DE MOS discussed equipment ABWN needed to acquire and professionals ABWN needed to bring in to make the project work. It seemed to DANIELS that DE MOS was actually trying to get the project off the ground. KABILAFKAS left the development of the project to DE MOS. DANIELS was more like a "cheerleader." KABILAFKAS, JEFF, ANDREW, and the lawyers handled paperwork needed for the company. KABILAFKAS encouraged DE MOS to go to conferences to promote the ABWN product. Everything at ABWN was done through KABILAFKAS.

DANIELS reviewed an SEC Annual Form 10K dated August 31, 2016. KABILAFKAS and STEPP handled SEC filings for ABWN. DANIELS was not asked to review SEC filings. DANIELS did not know DANIELS' electronic signature was used on SEC filings for ABWN at the time but later learned that happened. KABILAFKAS told DANIELS that ABWN had top lawyers that would take care of everything. DANIELS had little involvement despite his title as President of the company.

With respect to page 5 of the SEC Annual Form 10K, DANIELS did not

negotiate a relationship with the leading aerospace engineering designer. DANIELS did not negotiate a relationship with an appropriate aircraft firm. DANIELS did not negotiate with management and technical personnel. DANIELS did not negotiate the acquisition of APCENTIVE. KABILAFKAS and DE MOS negotiated the acquisition of APCENTIVE. DANIELS did not negotiate a relationship with a certification and engineering firm to support ABWN in the development of data and analysis to support the Federal Aviation Administration (FAA) Civil Certification on Infinitus. DANIELS was asked to attend meetings with an individual that used to work with the FAA and was serving as an advisor at the time. DANIELS represented himself as the President of ABWN at the meetings. KABILAFKAS also attended the meetings.

DANIELS reviewed an SEC Annual Form 10K dated August 2017. The statement on page 4 that DANIELS acquired control of ABWN was not true. DANIELS was on payroll at ABWN. DANIELS received a salary of $8,000 per month for 10 months. DANIELS was named the President, Treasurer, and Secretary of ABWN by KABILAFKAS. DANIELS was a signatory on the ABWN company bank account. DANIELS wrote a few checks for ABWN at the beginning until JEFF and ANDREW took over. KABILAFKAS told DANIELS to write checks. DANIELS sent a wire at ANDREW's instruction. ANDREW was instructed by KABILAFKAS to send the wire. Wires were sent to a software development company. DANIELS did not know whether the software company actually provided software or finished the project the company was hired to do.

DANIELS reviewed SEC Annual Form 10K dated August 31, 2018. The statement in Part 1 paragraph 2 which said that on October 20, 2015 DANIELS acquired control of the company by purchasing shares of common stock for $250,000 from LAWRENCE CHENARD (CHENARD) was not true. DANIELS never went by "J. EDWARD DANIELS" prior to ABWN. It was KABILAFKAS's idea for DANIELS to use the name "J. EDWARD DANIELS" because KABILAFKAS thought the name sounded more professional than JACK DANIELS.

DANIELS never met nor spoke with CHENARD. DANIELS did not even know about CHENARD's existence until several years after the acquisition. When DANIELS's wife read part of the SEC judgement to DANIELS. DANIELS's wife also read CHENARD's SEC deposition to DANIELS. DANIELS saw CHENARD's name with the transfer agent for ABWN. DANIELS saw CHENARD's name on documents, but DANIELS lied about buying shares from CHENARD. DANIELS was surprised by the scope of information learned from the SEC documents.

DANIELS reviewed Bates ending in 312594, ABWN 304, page 512, which was an employment agreement for DE MOS dated August 2016. The bottom of the agreement contained DANIELS's and DE MOS's signatures. DANIELS thought the signature on the document looked like DANIELS's signature. If ABWN needed

DANIELS's signature on a document, DANIELS just signed the document as President of ABWN even though DANIELS did not actually run the company. KABILAFKAS told DANIELS to sign documents as ABWN's President.

    DANIELS reviewed Bates ending in 312594, ABWN 528 which was a Financial Advisory Services Engagement document. The document was signed by DANIELS. DANIELS believed someone told DANIELS to sign the document. Sometimes DANIELS was asked to sign documents in the office, at home, or while out for coffee. Nothing happened without KABILAFKAS's approval. Everybody at ABWN checked with KABILAFKAS before doing anything, including DE MOS, WARREN, JEFF, and ANDREW. KABILAFKAS told DANIELS that WARREN had a military background and had great military contacts. KABILAFKAS thought WARREN could make connections between ABWN and the military for the military to use the ABWN product. Therefore, KABILAFKAS brought WARREN in as CEO of ABWN. DANIELS did not believe WARREN was the actual CEO of ABWN. WARREN was not in charge at ABWN despite the title of CEO. Everyone still knew they had to check with KABILAFKAS for everything substantive at the company.

    DANIELS reviewed Bates ending in 312594, FORTRESS ESCROW ABWN 402, which was titled Escrow Agreement with Fortress Escrow Company Ltd., A Thailand Corporation. DANIELS was not familiar with FORTRESS ESCROW. DANIELS signed the document, but DANIELS did not know FORTRESS ESCROW or KHWANTA SAYNET.

    DANIELS reviewed Bates ending in 312594, Patent and Trademark ABWN 539. DANIELS recalled previously seeing the document. The document was the patent for ABWN. On the Patent Assignment Cover Sheet dated October 15, 2016, ABWN was listed as receiving property. DANIELS's name and information were listed on the paperwork, but DANIELS was not involved with acquiring the patent for ABWN. KABILAFKAS told DANIELS that KABILAFKAS was going to acquire the patent from APCENTIVE. DANIELS did not know what APCENTIVE was at the time. DANIELS thought BRUCE HARRIS (HARRIS) owned APCENTIVE. KABILAFKAS told DANIELS that KABILAFKAS was going to give shares of ABWN to shareholders of APCENTIVE to acquire the patent. DANIELS was not involved in any negotiations or discussions about acquiring the patent from APCENTIVE.

    DANIELS reviewed Bates ending in 312594, KORN FERRY ABWN 415, which was a letter from KORN FERRY to DANIELS dated December 7, 2017. KABILAFKAS told DANIELS that KABILAFKAS was hiring KORN FERRY to find engineers for ABWN. DANIELS's signature on the document looked like a stamp. DANIELS was not sure whether the signature on the document was his actual signature. DANIELS did not think DANIELS saw the document. Had KABILAFKAS put the document in front of DANIELS and told DANIELS to sign it, DANIELS would have signed the document as President of ABWN. Some engineers or software developers were hired as contractors for the company, but DANIELS did not know whether those

hires were made through KORN FERRY.

DANIELS reviewed Bates ending in 312594, ABWN 157, which was a wire transfer initiated by DANIELS from the ABWN company bank account ending in 6593 to ZAPZORN. If DANIELS was asked to send this wire, DANIELS would have done so. GEORGE GABRIEL (GABRIEL) was associated with ZAPZORN. DANIELS met GABRIEL once at BOGIE'S. KABILAFKAS, DANIELS, DE MOS, JASON, WARREN, JEFF, and ANDREW were all at the meeting at BOGIE'S. KABILAFKAS told DANIELS that GABRIEL was going to do advertising for ABWN. DANIELS met NIKO KABILAFKAS (NIKO), but DANIELS did not remember whether NIKO was at the meeting. DANIELS did not recall meeting SCHEFFEY. DANIELS met CHRYSILIOS CHRYSILIOU (CHRYSILIOU). CHRYSILIOU was a lifelong friend of KABILAFKAS from Greece. DANIELS and CHRYSILIOU did not discuss ABWN when they met. DANIELS did not believe CHRYSILIOU had any involvement with the operation of ABWN, but DANIELS read somewhere that CHRYSILIOU made a donation to the Archbishop's church.

DANIELS reviewed Bates ending in 312594, ABWN 51, which was a letter from the SEC to DANIELS dated March 28, 2017 with subject "Potential Form 8-K Violation(s) by Airborne Wireless Network." DANIELS did not remember this letter. At some point, KABILAFKAS told DANIELS the SEC was inquiring into ABWN. KABILAFKAS told DANIELS the SEC did not know what the SEC was doing. KABILAFKAS said ABWN was not a 13C company but was a 12G or 12D company. KABILAFKAS told DANIELS lawyers were working on the issue. KABILAFKAS told DANIELS that KABILAFKAS hired an expert witness to prove ABWN was a specific type of company. DANIELS was not concerned about the SEC at the time. DANIELS recalled getting served with a subpoena from the SEC. KABILAFKAS told DANIELS to expect the subpoena and to let KABILAFKAS know when DANIELS received the subpoena. KABILAFKAS told DANIELS that KABILAFKAS would give the subpoena to the attorney to address. DANIELS trusted KABILAFKAS because KABILAFKAS was a long-term friend. DANIELS never discussed the subpoena with anyone else at ABWN.

DANIELS reviewed Bates 1036817. DANIELS took a few trips to Thailand in April 2017, September 2017, and February 2018. DANIELS had a good friend who lived in Thailand, so DANIELS had a free place to stay. At the time, round-trip airfare was around $1,300. Trips to Thailand were like a vacation for DANIELS. ABWN received the letter from the SEC about a month before DANIELS's April 2017 trip to Thailand. KABILAFKAS paid for DANIELS's trip to Thailand in April 2017, which DANIELS thought was probably KABILAFKAS's way of softening up DANIELS with respect to the SEC letter. KABILAFKAS also paid any time KABILAFKAS and DANIELS got food together.

KABILAFKAS and DE MOS lined up some business contacts in Europe. The

contacts were either investors or the owner of a software company in Europe that KABILAFKAS thought would be a beneficial merger for ABWN. DANIELS was impressed by the individual that owned the software company. DANIELS's purpose on the trip was to pretend to be the President of ABWN. DANIELS did not contribute anything during the meeting. DANIELS met two other people on the trip. DANIELS was introduced as the President of ABWN, but DANIELS did not talk in the meetings. KABILAFKAS and DE MOS pitched potential investors on ABWN at the meetings. KABILAFKAS pretended KABILAFKAS was an investor in ABWN when making pitches. KABILAFKAS never told potential investors KABILAFKAS actually controlled the company or that DANIELS was the fake "President" of the company. DE MOS knew DANIELS was a fake President. DANIELS and DE MOS never talked about DANIELS's fake position, but DANIELS thought it was obvious.

DANIELS reviewed Bates 312594, Form ID, ABWN 387, which was a Form ID Uniform Application for Access Codes to File on EDGAR. KABILAFKAS explained to DANIELS that EDGAR was another company that handled SEC filings which gave DANIELS some comfort about ABWN's SEC filings. DANIELS did not think EDGAR took false statements out of ABWN's filings to correct the statements. DANIELS remembered signing this document. KABILAFKAS asked DANIELS to sign this document. DANIELS did not know what "application for access codes for EDGAR" meant, but DANIELS trusted KABILAFKAS not to run ABWN into the ground no matter whether the information KABILAFKAS conveyed to the SEC was true or false. DANIELS never actually made any SEC filings for ABWN.

DANIELS did not speak to WARREN after ABWN's fallout with the SEC. DANIELS did not know JASON's thoughts on the fallout with the SEC. At some point, KABILAFKAS had everyone over for a barbecue, but no one talked about the SEC. DANIELS was not sure whether the barbecue was before or after the SEC lawsuit was filed. KABILAFKAS told everyone to "take the fifth" and everything would be fine. DANIELS had not been in touch with JEFF or ANDREW.

DANIELS knew JASON was mad at KABILAFKAS for cutting salaries at ABWN. When the ABWN stock price dropped, the conversations around the office were centered around the laser equipment and trying to put it all together. Stock price was not a part of conversations with DE MOS and others at the company. DANIELS understood ABWN was done as a company when KABILAFKAS brought in an investment company. In exchange for investing in ABWN, the investment company received warrants. The investment company started selling all the warrants immediately which drove ABWN down in a "death spiral," and everything fell apart. ABWN could not afford to pay rent for the office space and all operations stopped. DANIELS did not know what everyone else did after ABWN shut down.

    DANIELS reviewed Bates 886909-886913, which was a letter to COLUMBIA STOCK TRANSFER (COLUMBIA). The statement in the letter regarding the transfer request to put the shares DANIELS acquired from CHENARD into DANIELS's name was not true. With respect to Bates 886910, DANIELS did not recall seeing this document in 2016. KABILAFKAS told DANIELS that AMPLE-TEE was a company set up to create equipment for people with disabilities. With respect to Bates 886912, DANIELS did not know how the Irrevocable Stock Power document got filled out. It was possible KABILAFKAS filled everything out and put the document in front of DANIELS to sign. DANIELS communicated with COLUMBIA at KABILAFKAS's direction. At the time, DANIELS understood paperwork was involved to make the deal happen. KABILAFKAS often put documents in front of DANIELS to sign. DANIELS did not receive any certificates from ABWN with DANIELS's name on the certificates.

    DANIELS reviewed Bates 24416-Bates 24418, which was invoice 8231 from COLUMBIA. DANIELS emailed back and forth with COLUMBIA and reported back to KABILAFKAS what DANIELS received from COLUMBIA. DANIELS reviewed Tab 35, which was certificate 37 showing 84 million shares transferred to J. EDWARD DANIELS. DANIELS did not remember ever seeing this certificate. DANIELS had a phone call with MICHELLE JANSHEN (JANSHEN) from COLUMBIA. KABILAFKAS was also on the call. KABILAFKAS told DANIELS what to tell JANSHEN. The information DANIELS told JANSHEN about the transfer of shares from CHENARD to DANIELS was false. DANIELS knew the information was false at the time.

    DANIELS reviewed Tab 28, which was an AT&T call log for phone number 818-523-8822. 818-523-8822 was DANIELS's cell phone number. 805-279-6406 was KABILAFKAS's phone number. DANIELS and KABILAFKAS had a call on which KABILAFKAS told DANIELS they needed to have a call with the stock transfer agent. JANSHEN was patched into the call and both DANIELS and KABILAFKAS talked to JANSHEN. DANIELS represented himself as the President of ABWN and told JANSHEN what to do with the company's shares. DANIELS told JANSHEN what KABILAFKAS told DANIELS to say about transferring shares. DANIELS was not aware of anyone else from ABWN that talked to JANSHEN about transferring stock shares. KABILAFKAS told DANIELS that JEFF and ANDREW were going to handle everything and field incoming phone calls. If JANSHEN emailed DANIELS at daniels@calwestpartners.com, then DANIELS responded. If JANSHEN sent an email to DANIEL's ABWN email, then either KABILAFKAS, JEFF, or ANDREW responded.

    DANIELS reviewed Bates 71339, which was an email from DANIELS to JANSHEN dated October 19, 2016. DANIELS told KABILAFKAS that DANIELS was not going to deal with the ABWN email j.edward@airbornewirelessnetwork.com. KABILAFKAS told DANIELS not to worry and that JEFF and ANDREW would take care of DANIELS's ABWN email. KABILAFKAS told DANIELS to request JANSHEN send

318C-LA-3225533

Continuation of FD-302 of (U) Interview of Jack Daniels , On 03/19/2025 , Page 9 of 10

everything to DANIELS's ABWN email and either KABILAFKAS, JEFF, or ANDREW would communicate with JANSHEN going forward.

DANIELS reviewed Bates 24361, which was an email from DANIELS using daniels@calwestpartners.com to KABILAFKAS dated May 10, 2016. DANIELS reviewed Bates 24363, which was an image of money orders. DANIELS got the money orders for KABILAFKAS. DANIELS did not know what KABILAFKAS did with the money orders. DANIELS often got a "tip" for helping KABILAFKAS out with tasks like this. KABILAFKAS gave DANIELS a little more money than whatever the task cost and told DANIELS to keep the rest.

DANIELS reviewed Bates 961530, which was an email from KYLE TINGLE (TINGLE) to ANDREW AIRD (AIRD) dated December 11, 2015 with DANIELS and STEPP copied on the email. The part of the email that referenced DANIELS as the new majority owner of AMPLE-TEE was a lie. STEPP, DE MOS, JEFF, and ANDREW knew presenting DANIELS as the new majority owner of AMPLE-TEE was a sham. WARREN knew DANIELS was the President of ABWN in name only.

DANIELS reviewed Bates 31242, which was an email from JANSHEN to TINGLE dated January 11, 2016. DANIELS did not know the name MARK CRIMENI (CRIMENI) at the time. DANIELS did not recall KABILAFKAS mentioning CRIMENI's name. DANIELS reviewed Bates 31244, which was a shareholder list. DANIELS did not remember seeing a shareholder list while with ABWN. DANIELS did not recall seeing a list of shareholders with names of people from Thailand. KABILAFKAS told DANIELS that KABILAFKAS bought the company from a bunch of Thai shareholders.

MARK MCKINNEY (MCKINNEY) was a tenant in DANIELS's office. MCKINNEY met with KABILAFKAS once or twice. DANIELS did not know whether KABILAFKAS ever pitched MCKINNEY on ABWN. DANIELS did not know anyone else named MCKINNEY other than the tenant. DANIELS did not recall emailing with JANSHEN about MCKINNEY's shares in ABWN. DANIELS reviewed Bates SEC-USAO1-EPROD-000006161, which was an email from j.edward@airbornewirelessnetwork.com to JANSHEN dated October 26, 2017 and discussing transfers of shares to and from MCKINNEY. DANIELS was surprised by the email because, at the time, MCKINNEY was broke and sleeping in the office. MCKINNEY had no resources to be an investor in ABWN. DANIELS was not aware MCKINNEY had ABWN shares. In 2017, DANIELS still stayed in touch with MCKINNEY. Had someone told DANIELS he or she needed to get in touch with MCKINNEY at that time, DANIELS would not have said DANIELS did not know how to get in touch with MCKINNEY.

DANIELS did not know the name EKATERINA ZERNOS (ZERNOS). DANIELS met KABILAFKAS at CORFU RESTAURANT about 25 years ago, but did not know the names of the people that worked there or whether ZERNOS was an employee.

DANIELS did not remember the name of the secretary at ABWN. At the time DANIELS worked at ABWN, DANIELS knew the secretary's name. The secretary was only at ABWN a short time. The only other employee DANIELS recalled at ABWN was an engineer consultant.