**FILED**
CLERK, U.S. DISTRICT COURT

4/29/2026

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ KM _____ DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

February 2026 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA, | 2:24-CR-270(A)-MRA |
| Plaintiff, | F I R S T |
| v. | S U P E R S E D I N G <br> I N D I C T M E N T |
| KALISTRATOS KABILAFKAS, <br> aka "Kelly Kabilafkas," | [18 U.S.C. § 371: Conspiracy to Commit Securities Fraud; 15 U.S.C. §§ 78j(b), 78ff(a) and 17 C.F.R. § 240.10b-5: Securities Fraud; 18 U.S.C. § 1956(a)(1)(B)(i): Money Laundering; 18 U.S.C. §§ 981, 982 & 28 U.S.C. § 2461(c): Criminal Forfeiture] |
| Defendant. | |

The Grand Jury charges:

COUNT ONE

[18 U.S.C. §§ 371, 2(b)]

A.   OVERVIEW

1.   From in or around May 2014 to in or around November 2018, defendant KALISTRATOS KABILAFKAS, also known as "Kelly Kabilafkas," Jack Edward Daniels, and others known and unknown to the Grand Jury conspired to engage, and did engage, in a securities fraud scheme to defraud investors and potential investors whereby defendant

KABILAFKAS and Daniels, directly and through coconspirators and nominees: (i) covertly amassed the freely tradeable shares of a public company (Airborne Wireless Network) to conceal its true ownership; (ii) fraudulently misled investors about Airborne's ownership; and (iii) enriched themselves and others through the sale of Airborne stock.

RELEVANT INDIVIDUALS AND ENTITIES

At times relevant to this First Superseding Indictment:

2.    Defendant KABILAFKAS was a resident of Ventura County, California.

3.    Daniels was a resident of Ventura County.

4.    Ample-Tee, Inc. ("Ample-Tee") (stock ticker: ATLW) was a shell company incorporated in Nevada.  In or around October 2015, defendant KABILAFKAS acquired all the shares of Ample-Tee and subsequently renamed Ample-Tee as Airborne Wireless Network.

5.    Airborne Wireless Network was a publicly traded company (stock ticker: ABWN) with offices in Simi Valley, California, in the Central District of California.  Airborne Wireless Network was promoted as a business that was developing high-speed broadband wireless internet that would be delivered through a network of inflight aircraft.  Hereinafter, "Airborne" refers to the Ample-Tee/Airborne Wireless Network from in or around October 2015 and later.  According to public filings and disclosures, Daniels was the President and a Director of Airborne; however, defendant KABILAFKAS in fact controlled Airborne.

6.    Apcentive, Inc. ("Apcentive") was a privately held corporation incorporated in Nevada that maintained offices in the Central District of California.

2

7.   Coconspirator 1 ("CC-1") was a resident of Ventura County, California.

8.   Coconspirator 3 ("CC-3") was a resident of Greece and conspired with defendant KABILAFKAS to open brokerage accounts to facilitate the sale of Airborne stock.

9.   Coconspirator 4 ("CC-4") was a dual U.S.-Greek national and a resident of Ventura County, California.  CC-4 conspired with defendant KABILAFKAS to open brokerage accounts to facilitate the sale of Airborne stock.

10.  Charity A was a non-profit corporation that was established to support the charitable works of a religious ministry.  Funds that defendant KABILAFKAS used to purchase Airborne were transferred through Charity A's bank accounts.

11.  Foundation A was a charitable foundation that made donations to non-profit entities, including Charity A.  CC-1 was a trustee of Foundation A.

RELEVANT TERMS

12.  "Over the Counter" or "OTC" stock markets were operated by a network of broker-dealers who quoted prices to buy or sell penny stocks.  The broker-dealers would buy or sell penny stocks with other broker-dealers for their own account or for the account of the broker-dealer's customer.  An individual investor could place orders to buy or sell penny stocks available to trade on OTC stock markets through their broker-dealers.  Broker-dealers typically accepted orders to buy or sell through various means including orders placed via phone, email, or through online trading platforms.

13.  "Restricted Shares" referred to securities acquired in an unregistered, private sale from the issuing company (the issuer) or

3

from an affiliate of the issuer.  Restricted Shares typically bore a "restrictive" legend stating that the shares could not be resold in the OTC stock market unless the sale was otherwise exempt from the registration requirements of the federal securities laws and the U.S. Securities and Exchange Commission's ("SEC") rules.

14.  "Unrestricted Shares" referred to freely tradeable securities that were issued pursuant to a registration statement, did not bear a "restrictive" legend, and could be readily resold on the OTC stock market.

B.    OBJECT OF THE CONSPIRACY

15.  Beginning no later than in or around May 2014 and continuing through at least in or around November 2018, in Ventura County, within the Central District of California, and elsewhere, defendant KABILAFKAS and Daniels conspired with one another and others known and unknown to the Grand Jury to knowingly and willfully, directly and indirectly, by the use of the means and instrumentalities of interstate commerce and the mails, in connection with the purchase and sale of securities, to use and employ, and willfully cause others to use and employ, manipulative devices and contrivances by:

a.    employing, and causing others to employ, devices, schemes, and artifices to defraud;

b.    making, and causing others to make, untrue statements of material fact and omitting to state, and causing others to omit to state, material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

4

c.    engaging, and causing others to engage, in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons, to wit: (i) covertly amassing Unrestricted Shares of Airborne stock to conceal the true ownership of Airborne; (ii) fraudulently misleading investors regarding defendant KABILAFKAS's and Daniels's ownership and control of Airborne; and (iii) enriching themselves and others through the sale of Airborne stock, all in violation of Title 15, United States Code, Sections 78j(b) and 78ff(a), and Title 17, Code of Federal Regulations, Section 240.10b-5.

C.    MANNER AND MEANS OF THE CONSPIRACY

16.    The object of the conspiracy was to be carried out, and was carried out, in substance, as follows:

**Defendant KABILAFKAS Used Apcentive to Acquire
and Use the Wireless Patent**

a.    In or around May 2014, defendant KABILAFKAS, together with other coconspirators, acquired a controlling number of shares of Apcentive stock, a privately held corporation.  In or around April 2015, defendant KABILAFKAS caused Apcentive to acquire a patent (the "Wireless Patent").

b.    In or around July 2016, defendant KABILAFKAS and Daniels, together with other coconspirators, defrauded Apcentive investors by: (i) causing Apcentive to sell its Wireless Patent to Airborne in exchange for Restricted Shares of Airborne stock; and (ii) concealing that defendant KABILAFKAS secretly held all of Airborne's Unrestricted Shares that he planned to sell to enrich himself and others.

**Defendant KABILAFKAS and Others Conspired to Secretly Acquire All of Ample-Tee's (Airborne's) Stock**

c.    In or around 2012, Individual A's identity was used to incorporate Ample-Tee in Nevada and registered shares of Ample-Tee stock with the SEC, without Individual A's knowledge or permission.

d.    Unbeknownst to Individual A, multiple SEC filings falsely listed Individual A as Ample-Tee's sole shareholder, President, and Chief Executive Officer.  Individual A was also unaware that Unrestricted Shares of Ample-Tee stock were issued in or around September 2013 to approximately 30 shareholders purportedly from Thailand (the "Thai Shareholders").

e.    In or around 2015, defendant KABILAFKAS's coconspirators prepared pre-signed and pre-notarized, but otherwise blank, contracts for the purchase and sale of the Thai Shareholders' Ample-Tee stock certificates and related documents (collectively, the "Blank Sales Documents").

f.    Because the Blank Sales Documents were pre-signed but otherwise blank, defendant KABILAFKAS's coconspirators used the Blank Sales Documents as a device and scheme to defraud by fraudulently filling in a purchaser's name, purchase price, and date of purchase to fraudulently convey the Thai Shareholders' Unrestricted Shares of Ample-Tee's stock to any person.

g.    In or around May 2015, defendant KABILAFKAS and other coconspirators conspired to secretly acquire all of the shares of Airborne stock.

h.    In or around August 2015, defendant KABILAFKAS agreed to purchase all of Airborne's stock and the Blank Sales Documents. The Blank Sales Documents allowed defendant KABILAFKAS and other

6

coconspirators to falsely fill in the purchaser's name, purchase price, and date of purchase to fraudulently convey the Thai Shareholders' Unrestricted Shares of Airborne's stock to any person.

i.    Prior to finalizing the purchase of Airborne's stock, in order to confirm that Airborne's stock could be used in a scheme to defraud, defendant KABILAFKAS verified that: (i) an SEC-registered broker-dealer, Glendale Securities ("Glendale"), would accept the falsely completed Blank Sales Documents and Thai Shareholders' Airborne stock certificates for deposit; and (ii) Airborne stock could be electronically traded on the OTC stock market.

j.    To secretly obtain Airborne's stock, defendant KABILAFKAS and CC-1 caused Foundation A to transfer $475,000 to Charity A.

k.    On or about August 19, 2015, defendant KABILAFKAS used the $475,000 from Charity A's bank account to make a $355,000 deposit to an escrow account for the purpose of acquiring all of Airborne's stock.

l.    On or about October 20, 2015, defendant KABILAFKAS finalized the sale of Airborne's stock for $350,000.  Defendant KABILAFKAS caused multiple wire transfers for approximately $350,000 from Charity A for the Thai Shareholders' Airborne stock certificates and related Blank Sales Documents to be sent to defendant KABILAFKAS, which gave defendant KABILAFKAS complete control of Airborne's stock.

**Defendant KABILAFKAS Recruited Daniels but Maintained Control of Airborne**

m.    In or around August 2015, shortly before defendant KABILAFKAS's acquisition of Airborne and to conceal defendant KABILAFKAS's involvement with the management of Airborne, defendant

7

KABILAFKAS recruited Daniels to act as Airborne's new president and sole director.

n.   Beginning on or about October 20, 2015, defendant KABILAFKAS conspired with Daniels to direct and control Airborne, even though defendant KABILAFKAS held no formal position as an officer or director.

o.   Despite having no formal role in Airborne, defendant KABILAFKAS selected and exercised decision-making and control over Airborne's CEO and other executives, and directed Daniels on how to respond to inquiries from Airborne's public accounting firm.

**Defendant KABILAFKAS and Daniels Filed False and Materially Misleading Reports About the Sale of Airborne on the SEC's Website**

p.   On or about October 20, 2015, immediately following the purchase of Airborne, defendant KABILAFKAS and Daniels knowingly and willfully filed an SEC Form 8-K published on the SEC's website that contained material misrepresentations and omissions. Specifically, the SEC Form 8-K:

i.   Falsely stated that Daniels purchased all of Individual A's approximately 84.1 million Restricted Shares of Airborne stock for $250,000 cash using Daniels's personal funds. This statement was false and misleading because Daniels had not purchased any Airborne stock, nor were any of Daniels's personal funds used to make such a purchase;

ii.  Concealed the fact that defendant KABILAFKAS and other coconspirators had acquired all of the Unrestricted Shares of Airborne, which defendant KABILAFKAS could sell at any time; and

8

iii. Falsely stated that Daniels——Airborne's only officer and director of record——(1) was the sole holder of approximately 84.1 million shares of Airborne stock, purchased with Daniels's personal funds, and (2) "held voting power equal to approximately 74% of Airborne's voting securities."  In fact, on or about October 20, 2015, defendant KABILAFKAS acquired all of Airborne's Restricted Shares (purportedly purchased by Daniels) and all of Airborne's Unrestricted Shares.

q.    Beginning at least on or about October 20, 2015 through at least November 14, 2018, defendant KABILAFKAS and Daniels knowingly and willfully filed and caused to be filed reports on the SEC's website, that contained untrue statements of material fact and omitted facts that made statements materially misleading, including but not limited to: (1) an SEC Form 10-K, annual report for the fiscal year ending August 31, 2016, filed with the SEC on or about December 13, 2016; (2) an SEC Form 10-K, annual report for the fiscal year ending August 31, 2017, filed with the SEC on or about November 14, 2017; and (3) an SEC Form 10-K, annual report for the fiscal year ending August 31, 2018, filed with the SEC on or about November 14, 2018.  Within these reports, defendant KABILAFKAS and Daniels made, and caused to be made, various false and misleading statements and omissions, including that:

i.    Daniels purchased all of Individual A's approximately 84.1 million Restricted Shares of Airborne stock for $250,000; and

ii.    Airborne had 31 shareholders, when in fact, defendant KABILAFKAS had acquired all of Airborne's shares.

9

r.    Defendant KABILAFKAS concealed, and caused Airborne to omit from Airborne's SEC filings, that defendant KABILAFKAS received, directly and indirectly, funds from Airborne's bank accounts.

s.    Daniels caused Airborne to falsely state in its SEC filings, that Daniels at relevant times did not receive compensation from Airborne.

**Defendant KABILAFKAS and His Coconspirators Traded Unrestricted Shares of Airborne Stock**

t.    Beginning in or around September 2016, defendant KABILAFKAS and other coconspirators submitted, and caused others to submit, falsified Airborne stock certificates and related Blank Sales Documents to the Transfer Agent for Airborne to deceive the Transfer Agent into reissuing the stock certificates in the names of defendant KABILAFKAS, his coconspirators, and third-party nominees.

u.    In or around September and October 2016, for the purpose of depositing and trading Unrestricted Shares of Airborne stock, defendant KABILAFKAS, CC-1, and other coconspirators, opened additional brokerage accounts with Glendale in the names of CC-1, CC-3, and in the name of a nominee ("Nominee 1"), who was an associate known to defendant KABILAFKAS.

v.    Beginning in or around November 2016, Glendale stopped accepting new deposits of Unrestricted Shares of Airborne stock.

w.    After Glendale stopped accepting new deposits, defendant KABILAFKAS, CC-1, and other coconspirators submitted, and caused others to submit, certificates of Unrestricted Shares of Airborne stock fraudulently obtained from the Transfer Agent and the falsified Blank Sales Documents to other broker-dealers to deceive

10

the broker-dealers into accepting the Unrestricted Shares of Airborne stock for deposit.

x.    From in or around August 2016 to in or around April 2018, defendant KABILAFKAS knowingly and willfully sold millions of Unrestricted Shares of Airborne stock to the investing public through brokerage accounts in defendant KABILAFKAS's own name and in the names of other coconspirators and nominees resulting in defendant KABILAFKAS obtaining millions of dollars in personal profit.

y.    Defendant KABILAFKAS concealed his ownership and control of the Unrestricted Shares of Airborne stock through third party intermediaries and bank accounts held in the name of one of the Thai Shareholders ("Nominee 2") and other nominees, which accounts were controlled by defendant KABILAFKAS.

z.    From on or about August 25, 2016, to on or about September 2, 2016, defendant KABILAFKAS and his coconspirators profited by placing orders through Glendale to sell hundreds of thousands of defendant KABILAFKAS's Unrestricted Shares of Airborne stock held in Nominee 2's brokerage account, which defendant KABILAFKAS controlled.

**Defendant KABILAFKAS Used Airborne to Pay for Television and Other Promotional Advertising Campaigns**

aa.    Defendant KABILAFKAS caused Airborne to pay millions of dollars for promotional advertising campaigns for television, print, and other media advertising.

bb.    Defendant KABILAFKAS concealed from Airborne's investors that Airborne's majority shareholder——defendant KABILAFKAS——was directing investors' money to fund a media advertising campaign designed to drive up Airborne's stock price and enable defendant

11

KABILAFKAS to sell his Unrestricted Shares for substantial personal profit.

cc.  Defendant KABILAFKAS orchestrated Airborne's television advertising campaign.  For example, in or around September 2016, defendant KABILAFKAS arranged for Airborne to advertise on cable television news networks to promote the investing public's interest in buying Airborne stock.

dd.  Defendant KABILAFKAS caused Airborne to purchase through an advertising company ("Advertising Co. 1") television commercial airtime from in or around November 2016 to in or around July 2018.

ee.  Defendant KABILAFKAS willfully and knowingly orchestrated this advertising campaign for the purpose of inflating Airborne's stock price.

ff.  On or about August 6, 2016, defendant KABILAFKAS contacted a representative of Advertising Co. 1 ("Individual B"), about working on a "CRAZY PROJECT right up [Individual B's] alley."

gg.  Defendant KABILAFKAS directed Advertising Co. 1 on the content and placement of Airborne's advertisements.  Defendant KABILAFKAS negotiated and directed an agreement for Advertising Co. 1 to produce television commercials and other advertising media for Airborne.

hh.  On or about October 25, 2016, defendant KABILAFKAS sent a text message to Individual B to confirm receipt of Advertising Co. 1's media buying proposal for Airborne.  Defendant KABILAFKAS instructed Individual B to book television advertising timeslots on cable news networks including CNBC, Fox Business, and Fox News. Defendant KABILAFKAS added "I don't wanna to [sic] give anyone chance

12

to drag their feet.  Lets [sic] pay for spots, make videos and start the party."

ii.  Airborne's television commercials typically aired on multiple days and on multiple channels during specific periods that ranged from approximately two-week to six-week periods.  During many of these television advertising periods, Airborne's stock price increased for short periods of time.

jj.  For example, Airborne ran television commercials from on or about December 5, 2016, to on or about December 30, 2016.  During this period, Airborne's stock price increased from approximately $0.72 per share to $1.69 per share, which was an increase of approximately 135%.

kk.  Similarly, Airborne paid for television commercials from on or about January 25, 2017, to on or about February 28, 2017.  During that same period, Airborne's stock price increased from approximately $1.30 per share to its peak of $4.07 per share, which was an increase of more than 200%.

ll.  Defendant KABILAFKAS caused Airborne to buy additional television commercial airtime spots to attempt to replicate the spikes in Airborne's stock price.  For example, in or around October 2017, Airborne ran its television commercials approximately seven times a day on Fox Business and Fox News.  In the first half of October 2017, Airborne's stock price increased from approximately $0.81 to approximately $1.45, which was an increase of approximately 80%.

mm.  From on or about December 18, 2017, to on or about December 29, 2017, defendant KABILAFKAS caused Airborne to increase its television advertising to approximately nine to 14 times per day

13

on Fox News and Fox Business.  During this period, Airborne's stock price increased from approximately $1.22 to approximately $2.96 per share, which was an increase of more than 140%.

nn.  The advertising purchases defendant KABILAFKAS orchestrated were the drivers of Airborne's stock, and by on or about January 2, 2018, days after the television advertising run on Fox News and Fox Business ended, Airborne's stock price fell by almost one-third, from approximately $2.96 to approximately $1.97.

**Defendant KABILAFKAS Dumped His Secretly Acquired Unrestricted Shares During the Promotional Advertising Campaign**

oo.  Defendant KABILAFKAS capitalized on the stock price spikes by selling substantial volumes of his secretly acquired Unrestricted Shares of Airborne stock.  For example, between on or about December 18, 2017, and on or about December 29, 2017, during which time Airborne increased its television advertising on Fox News and Fox Business to approximately nine to fourteen times per day and Airborne's stock price increased to approximately $2.96 per share, defendant KABILAFKAS sold substantial volumes of his secretly acquired Unrestricted Shares of Airborne stock through brokerage accounts held in his own name and in accounts he controlled but were held in the names of coconspirators as shown below:

| Airborne Stock Sales from on or about December 18, 2017, to on or about December 29, 2017 | | | |
|---|---|---|---|
| Account Holder | Broker-Dealer | Approx. Number Shares Sold | Approx. Gross Sales of ABWN |
| Defendant KABILAFKAS | Glendale | 255,000 | $620,000 |
| CC-3 | Glendale | 353,000 | $913,000 |
| CC-4 | Interactive Brokers LLC | 420,000 | $1,003,000 |

14

**Defendant KABILAFKAS Controlled and Directed Trading in the Brokerage Accounts of Coconspirators and Nominees**

pp.  Defendant KABILAFKAS controlled and directed trading in the brokerage accounts for CC-3, CC-4, Nominee 1, Nominee 2, and other coconspirators and nominees, including through the following means:

i.    Defendant KABILAFKAS used email accounts and telephone lines associated with the brokerage accounts to impersonate the accountholders;

ii.   Defendant KABILAFKAS impersonated the coconspirators and nominees to place orders with Broker-Dealers to sell the Unrestricted Shares of Airborne stock; and

iii.  Defendant KABILAFKAS impersonated the coconspirators and nominees to grant other coconspirators trading authorization over certain nominees' accounts.

D.    OVERT ACTS

17.  On or about the following dates, in furtherance of the conspiracy and to accomplish its object, defendant KABILAFKAS and Daniels, together with their coconspirators, committed and willfully caused others to commit the following overt acts, among others, within the Central District of California, and elsewhere:

Overt Act No. 1:    On August 5, 2015, defendant KABILAFKAS forwarded an email to Apcentive's president that contained electronic copies of the Thai Shareholders' Airborne stock certificates and the Blank Sales Documents.

Overt Act No. 2:    On August 17, 2015, CC-1 sent wire transfer instructions on behalf of Foundation A to wire $475,000 to Charity A's bank account.

15

Overt Act No. 3: On August 19, 2015, defendant KABILAFKAS completed a pre-signed but otherwise blank bank check from Charity A's Chase bank account ending in x5219 for approximately $355,000 and caused the check to be deposited in his attorney's trust account at First Citizens Bank ending in x9810.

Overt Act No. 4: On September 4, 2015, defendant KABILAFKAS opened a securities brokerage account at Glendale for the purpose of depositing and selling defendant KABILAFKAS's secretly acquired Unrestricted Shares of company stock.

Overt Act No. 5: On October 20, 2015, defendant KABILAFKAS and Daniels filed, and caused to be filed, with the SEC an SEC Form 8-K falsely stating that Daniels purchased all of the Restricted Shares of Airborne stock on October 20, 2015, for $250,000 in cash using his own personal funds.

Overt Act No. 6: On December 13, 2016, defendant KABILAFKAS and Daniels filed, and caused to be filed, with the SEC an SEC Form 10-K annual report for the fiscal year ending August 31, 2016, falsely claiming that Daniels had purchased the approximately 84 million restricted shares of Airborne stock for $250,000 on October 20, 2015.

Overt Act No. 7: On October 26, 2016, Daniels signed a check from Airborne's Wells Fargo Bank account ending in x6593 to Advertising Co. 1 for $25,000 so that Advertising Co. 1 would begin preparing marketing materials for Airborne's advertising campaign.

Overt Act No. 8: On November 14, 2017, defendant KABILAFKAS and Daniels filed, and caused to be filed, with the SEC an SEC Form 10-K annual report for the fiscal year ending August 31, 2017, falsely claiming that Daniels had purchased the approximately 84

16

million Restricted Shares of Airborne stock for $250,000 on October 20, 2015.

Overt Act No. 9:    On April 20, 2018, defendant KABILAFKAS sold approximately 17,000 shares of Airborne stock through his brokerage account at Merrill Lynch, Pierce, Fenner & Smith Inc. ending x5T95.

Overt Act No. 10:    On April 27, 2018, within the Central District of California, defendant KABILAFKAS sold, and caused to be sold, approximately 21,100 shares of Airborne stock for approximately $21,736 through CC-4's broker-dealer account at Interactive Brokers LLC ending x1788.

Overt Act No. 11:    On May 22, 2018, CC-1 sold approximately 900 shares of Airborne stock for approximately $454.50 through his Charles Schwab & Co., Inc. brokerage account ending x2969.

Overt Act No. 12:    On November 14, 2018, defendant KABILAFKAS and Daniels filed and caused to be filed with SEC a Form 10-K, annual report for the fiscal year ending August 31, 2018, falsely claiming that Daniels had purchased the 84.1 million restricted shares of Airborne stock for $250,000 on October 20, 2015.

COUNT TWO

[15 U.S.C. §§ 78j(b) and 78ff(a); 18 U.S.C. § 2;

17 C.F.R. § 240.10b-5]

18.    The Grand Jury realleges paragraphs 1 through 14, 16, and 17 of this First Superseding Indictment here.

A.    THE SCHEME TO DEFRAUD

19.    Beginning no later than in or around May 2014 and continuing through at least in or around November 2018, in Ventura County, within the Central District of California, and elsewhere, defendant KABILAFKAS, together with others known and unknown, each aiding and abetting the others, knowingly and willfully, directly and indirectly, by the use of the means and instrumentalities of interstate commerce and the mails, in connection with the purchase and sale of securities, used and employed, and willfully cause others to use and employ, manipulative devices and contrivances by:

a.    employing, and causing others to employ, devices, schemes, and artifices to defraud;

b.    making, and causing others to make, untrue statements of material fact and omitting to state, and causing others to omit to state, material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

c.    engaging, and causing others to engage, in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons.

B.    THE PURPOSE OF THE SCHEME AND ARTIFICE

20.    It was the purpose of the scheme and artifice for defendant KABILAFKAS and others to enrich themselves by: (i) covertly amassing

18

Unrestricted Shares of Airborne stock to conceal the true ownership of the Unrestricted Shares of Airborne, (ii) fraudulently misleading investors regarding defendant KABILAFKAS's and Daniels's ownership of the Unrestricted Shares of Airborne stock, and (iii) enriching themselves and others through the sale of Airborne's stock.

C.    THE MANNER AND MEANS OF THE SCHEME AND ARTIFICE

21.    The scheme was carried out as described in paragraph 16 of this First Superseding Indictment.

D.    EXECUTION OF THE FRAUDULENT SCHEME

22.    On or about April 27, 2018, in Ventura County, within the Central District of California, and elsewhere, for the purpose of executing the scheme to defraud described above, and in furtherance of the manipulative and deceptive devices described above and using the instrumentalities of interstate commerce, defendant KABILAFKAS and others, each aiding and abetting the others, sold and willfully caused to be sold approximately 21,100 shares of Airborne stock for approximately $21,736 through CC-4's account at Interactive Brokers LLC ending X1788.

COUNTS THREE THROUGH EIGHT

[18 U.S.C. §§ 1956(a)(1)(B)(i); 2(b)]

23. The Grand Jury realleges paragraphs 1 through 14, 16, 17, and 19 through 22 of this First Superseding Indictment here.

A.  OVERVIEW

24. Beginning in or around August 2016 and continuing through at least in or around January 2024, in Ventura County, within the Central District of California, and elsewhere, defendant KABILAFKAS, knowingly and intentionally conducted and willfully caused to be conducted financial transactions involving property that represented the proceeds of securities fraud, which transactions were designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of those proceeds.

25. Defendant KABILAFKAS engaged, directly and indirectly, in a series of financial transactions to conceal that he was the true owner and controller of the Unrestricted Shares of Airborne stock and to conceal the ownership, the control, the source, and the location of the funds resulting from the fraudulent sale of the Unrestricted Shares of Airborne stock from Airborne investors and employees, government agencies (including the SEC), and law enforcement, by:

i. Opening at least six different securities brokerage trading accounts in the names of CC-3, CC-4, Nominee 1, Nominee 2, and other coconspirators and nominees (collectively the "Brokerage Accounts") in order to sell Unrestricted Shares of Airborne stock;

ii. Transferring funds from the sale of the Unrestricted Shares of Airborne stock from the Brokerage Accounts to numerous different accounts held with several different banks

20

(collectively, the "Funds Accounts") in the United States, the Cayman Islands, Greece, and elsewhere;

iii. Using the Funds Accounts to conceal the ownership and control of the fraudulently obtained funds by putting the Funds Accounts in the names of nominee owners, including CC-3, CC-4, Nominee 1, and Nominee 2, and in the names of various trusts, when, in fact, defendant KABILAFKAS controlled, directly or indirectly, the Funds Accounts;

iv.  Transferring fraudulently obtained funds from the Brokerage Accounts and Funds Accounts by wire, check, and cashier's check to various property escrow agents to purchase multiple residential real properties in the Central District of California that were titled in the names of various trusts controlled by defendant KABILAFKAS (collectively, the "Residential Properties");

v.  Converting fraudulently obtained funds invested in certain of the Residential Properties into liquid home equity lines of credit ("HELOC") loans in the name of CC-4 from EastWest Bank in amounts ranging from $400,000 to $810,000 per property (collectively, the "HELOC Accounts"); and

vi.  Using the fraudulently obtained funds that were concealed through the Brokerage Accounts, Funds Accounts, and HELOC Accounts to (1) make payments to defendant KABILAFKAS, his coconspirators, and his family members; and (2) pay for defendant KABILAFKAS's personal expenses, including, but not limited to, real property, personal vehicles, recreational vehicles, a life insurance policy, and other expenditures on goods and services.

26.  On or about September 12, 2023, the United States District Court for the Southern District of New York entered a monetary

judgment finding that defendant KABILAFKAS was required to pay money damages in a civil suit brought by the SEC in connection with the sale of Airborne securities, SEC v. Airborne Wireless Network, et al., 1:21-cv-01772-CM (S.D.N.Y.).  The District Court scheduled additional proceedings in 2024 to determine how much in monetary relief defendant KABILAFKAS would be required to pay.  After the district court entered the monetary judgment against defendant KABILAFKAS, he engaged in certain financial transactions to transfer ownership or control and to further conceal or disguise the nature, location, source, ownership, and control of funds and property traceable to the unlawful proceeds derived from the sale of Airborne stock.

27.  Defendant KABILAFKAS conducted transactions constituting, derived from, or traceable to proceeds from the fraudulent sale of Airborne stock, and such proceeds were: subsequently transferred through certain Brokerage Accounts, then through certain Funds Accounts, then used for the purchase of certain Residential Properties, and then transferred through certain other Funds Accounts, including those identified in Counts 3 through 8 below.

B.    CONCEALMENT MONEY LAUNDERING TRANSACTIONS

28.  On or about the dates set forth below, in Ventura County, within the Central District of California, and elsewhere, defendant KABILAFKAS, and others known and unknown to the Grand Jury, knowing the property involved represented the proceeds of some form of unlawful activity, and which property was, in fact, the proceeds of specified unlawful activity, namely, securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5, and knowing that

the transactions were designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of said specified unlawful activity, knowingly conducted and willfully caused to be conducted the following financial transactions:

| COUNT | DATE | FINANCIAL TRANSACTION |
|-------|------|-----------------------|
| THREE | September 29, 2022 | A wire transfer of approximately $492,922.16 drawn on All Valley Escrow's City National Bank account ending in x 6066 and deposited into the Wells Fargo Bank account ending in x1617 held in the name of the Kabilafkas Irrevocable Trust. |
| FOUR | October 3, 2022 | A wire transfer of approximately $430,000 drawn on the Wells Fargo Bank account ending in x1617 held in the name of the Kabilafkas Irrevocable Trust and deposited into defendant KABILAFKAS's Piraeus Bank SA account ending in x5685 in Athens, Greece. |
| FIVE | December 19, 2023 | A wire transfer of approximately $480,000 drawn on Priority Title Company's Open Bank account ending in x3598 and deposited into the Wells Fargo Bank account ending in x1617 held in the name of the Kabilafkas Irrevocable Trust. |
| SIX | December 26, 2023 | A wire transfer of approximately $82,000 drawn on the Kabilafkas Irrevocable Trust's Wells Fargo account ending x1617 and deposited into Pioneer Title Agency, Inc.'s Zions Bancorporation d/b/a National Bank of Arizona account ending x1694. |
| SEVEN | December 26, 2023 | A cash withdrawal of approximately $100,000 from a Wells Fargo branch in the Central District of California from defendant KABILAFKAS's Wells Fargo Bank account ending in x6578. |

//

23

| COUNT | DATE | FINANCIAL TRANSACTION |
|---|---|---|
| EIGHT | January 26, 2024 | A cash withdrawal of approximately $100,000 from a Wells Fargo branch in the Central District of California from Wells Fargo Bank account ending in x1617 controlled by defendant KABILAFKAS and held in the name of the Kabilafkas Irrevocable Trust. |

FORFEITURE ALLEGATION ONE

[18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c)]

29.    Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), in the event of the conviction of defendant KALISTRATOS KABILAFKAS of the offenses set forth in either of Counts One through Two of this First Superseding Indictment.

30.    The defendant, if so convicted, shall forfeit to the United States of America the following:

a.    All right, title, and interest in any and all property, real or personal, constituting, or derived from, any proceeds traceable to the offenses, including, but not limited to, the following specific property:

i.    The real property located at 13892 Saddleback Drive, Moorpark, California 93021, more particularly described at Assessor's Parcel Number 513-0-22-055;

ii.    The real property located in Ventura County, California, 13908 Saddleback Drive, Moorpark, California 93021, more particularly described at Assessor's Parcel Number 513-0-220-065;

iii.    The real property located in Ventura County, California, 13642 Pinnacle Way, Moorpark, California 93021, more particularly described at Assessor's Parcel Number 513-0-086-105;

iv.    The real property located in Ventura County, California, 13649 Pinnacle Way, Moorpark, California 93021, more particularly described at Assessor's Parcel Number 513-0-085-185;

25

v.      The real property located in Ventura County, California, 7024 Baneberry Avenue, Moorpark, California 93021, more particularly described at Assessor's Parcel Number 513-0-283-015;

vi.      The real property located in Ventura County, California, 7107 Oswego Court, Moorpark, California 93021, more particularly described at Assessor's Parcel Number 513-0-283-375;

vii.      The real property located in Ventura County, California, 7106 Oswego Court, Moorpark, California 93021, more particularly described at Assessor's Parcel Number 513-0-283-315;

viii.      The real property located in Ventura County, California, 4377 Alder Circle, Moorpark, California 93021, more particularly described at Assessor's Parcel Number 512-0-372-075;

ix.      One 2020 Ford F-250 pickup truck, bearing Vehicle Identification Number 1FT8W2BT4LEE69555;

x.      One 2023 Mercedes Benz C63 AMG S, bearing Vehicle Identification Number W1KWJ8HB8PG123189;

xi.      One 2023 Land Rover Defender, bearing Vehicle Identification Number SALEJ7EX5P2110406;

xii.      All Monies, Including Insurance Benefits and Interest, Payable Under Life Insurance Policy Number 93224166 Held At John Hancock Life Insurance Company (USA); and

b.   To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

31.  Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), any defendant so convicted shall forfeit substitute property, up to the value of the property described in the preceding paragraph if, as the

26

result of any act or omission of said defendant, the property described in the preceding paragraph or any portion thereof (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

FORFEITURE ALLEGATION TWO

[18 U.S.C. § 982]

32.   Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 982(a)(1), in the event of the conviction of defendant KALISTRATOS KABILAFKAS of the offenses set forth in any of Counts Three through Eight of this First Superseding Indictment.

33.   The defendant, if so convicted, shall forfeit to the United States of America the following:

a.   All right, title, and interest in any and all property, real or personal, involved in such offense, and any property traceable to such property, including, but not limited to, the following specific property:

i.      The real property located at 13892 Saddleback Drive, Moorpark, California 93021, more particularly described at Assessor's Parcel Number 513-0-22-055;

ii.     The real property located in Ventura County, California, 13908 Saddleback Drive, Moorpark, California 93021, more particularly described at Assessor's Parcel Number 513-0-220-065;

iii.    The real property located in Ventura County, California, 13642 Pinnacle Way, Moorpark, California 93021, more particularly described at Assessor's Parcel Number 513-0-086-105;

iv.     The real property located in Ventura County, California, 13649 Pinnacle Way, Moorpark, California 93021, more particularly described at Assessor's Parcel Number 513-0-085-185;

v.      The real property located in Ventura County, California, 7024 Baneberry Avenue, Moorpark, California 93021, more particularly described at Assessor's Parcel Number 513-0-283-015;

vi.      The real property located in Ventura County, California, 7107 Oswego Court, Moorpark, California 93021, more particularly described at Assessor's Parcel Number 513-0-283-375;

vii.      The real property located in Ventura County, California, 7106 Oswego Court, Moorpark, California 93021, more particularly described at Assessor's Parcel Number 513-0-283-315;

viii.      The real property located in Ventura County, California, 4377 Alder Circle, Moorpark, California 93021, more particularly described at Assessor's Parcel Number 512-0-372-075;

ix.      One 2020 Ford F-250 pickup truck, bearing Vehicle Identification Number 1FT8W2BT4LEE69555;

x.      One 2023 Mercedes Benz C63 AMG S, bearing Vehicle Identification Number W1KWJ8HB8PG123189;

xi.      One 2023 Land Rover Defender, bearing Vehicle Identification Number SALEJ7EX5P2110406;

xii.      All Monies, Including Insurance Benefits and Interest, Payable Under Life Insurance Policy Number 93224166 Held At John Hancock Life Insurance Company (USA); and

b.   To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

34.  Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1), and Title 18, United States Code, Section 982(b)(2), any defendant so convicted shall forfeit substitute property, up to the value of the

property described in the preceding paragraph if, as the result of any act or omission of said defendant, the property described in the preceding paragraph or any portion thereof: (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.  Substitution of assets shall not be ordered, however, where the convicted defendant acted merely as an intermediary who handled but did not retain the property in the course of the money laundering offense unless the defendant, in committing the offense or offenses giving rise to the forfeiture,

/////

conducted three or more separate transactions involving a total of $100,000.00 or more in any twelve-month period.

                                        A TRUE BILL


                                        /S/
                                        Foreperson


TODD BLANCHE
Acting Attorney General

BILAL A. ESSAYLI
First Assistant United States
Attorney


ALEXANDER B. SCHWAB
Assistant United States Attorney
Acting Chief, Criminal Division

ROGER A. HSIEH
Assistant United States Attorney
Chief, Major Frauds Section

JAMES C. HUGHES
Assistant United States Attorney
Major Frauds Section

LORINDA I. LARYEA
Chief, Fraud Section
Criminal Division
U.S. Department of Justice

THEODORE M. KNELLER
Trial Attorney, Fraud Section
Criminal Division
U.S. Department of Justice

PAUL A. HAYDEN
Trial Attorney, Fraud Section
Criminal Division
U.S. Department of Justice

31